# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBERT SPURLOCK and | ) | |
| RONNIE MARSHALL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 3:04-1148 |
| | ) | JUDGE ECHOLS |
| RICK HALPRIN and | ) | |
| NATHAN DIAMOND-FALK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

This is a legal malpractice action brought by Tennessee Plaintiffs Robert Spurlock and Ronnie Marshall against their former attorneys, Rick Halprin and Nathan Diamond-Falk, of Chicago, Illinois, pursuant to the Court's diversity jurisdiction. Plaintiffs claim the Defendants failed to provide them with competent legal representation in their civil rights lawsuits filed in this Court on October 9, 1996. Spurlock v. Whitley, No. 3:96-0926, consolidated with Marshall v. Whitley, No. 3:96-0927.

In the underlying lawsuits, Plaintiffs alleged they were falsely accused, prosecuted and imprisoned for the homicide of Lonnie Malone. They claimed that prosecutors Lawrence Ray Whitley and Jerry R. Kitchen, Hendersonville Detective John D. Coarsey, Sumner County Deputy Sheriff Danny Satterfield, Henry Apple, and others conspired to violate their constitutional rights and maliciously prosecuted them for the Malone murder. In addition to

1

seeking damages from the individual defendants, Plaintiffs sought to hold the City of Hendersonville and Sumner County liable.

Plaintiffs now allege in this action that, as a result of the incompetent legal representation of Halprin and Diamond-Falk, this Court granted summary judgment in favor of the defendants in the underlying civil rights actions, and the Sixth Circuit affirmed. Spurlock v. Whitley, 79 Fed. Appx. 837 (6th Cir. 2003). As a consequence, Plaintiffs allege they lost the opportunity to recover damages from the alleged wrongdoers for the violation of their civil rights.

The instant malpractice action came before the Court for bench trial on March 7 and 8, 2006. Having heard the evidence and having considered the parties' proposed findings of fact and conclusions of law, the Court now enters its Findings of Fact and Conclusions of Law as follows:

## I.  FINDINGS OF FACT

In September and October of 1990, separate Sumner County juries convicted Ronnie Marshall and Robert Spurlock of first-degree murder in the February 1989 death of Lonnie Malone. District Attorney General Lawrence Ray Whitley and his assistant, Jerry R. Kitchen, conducted the prosecutions. In each case, Henry "Skully" Apple testified as the primary witness linking Marshall and Spurlock to the murder.

2

During the prosecutions, Whitley and Kitchen provided defense counsel with four statements Apple gave to investigators in 1989 and one he gave on April 30, 1990. (Trial Ex. 1, <u>State v. Spurlock</u>, 874 S.W.2d 602, 613 (Tenn. Ct. App. 1993). The prosecution did not furnish defense counsel with an audio tape recording and a video tape recording of Coarsey's and Satterfield's coercive interrogation of Apple on Friday, April 27, 1990, or an audio tape recording made on Sunday, April 29, 1990, of a conversation between an unknown deputy sheriff and Apple. (<u>Id.</u> at 608, 613-614.) The prosecution suppressed these statements because they reflected unfavorably on Apple's credibility, and they would have revealed that Coarsey made numerous promises to Apple in an attempt to extract helpful information from Apple, even though Apple vehemently denied he was present when Malone was killed. (<u>Id.</u> at 608, 614.) The audio tape recording contained numerous discussions concerning Apple's desire to be released from the Sumner County Jail where he was serving time on a child support matter. (<u>Id.</u>)

The State also did not disclose that Coarsey and Satterfield called Whitley to the jail on the evening of Friday, April 27. The suppressed videotape taken that evening included a colloquy between Whitley and Apple during which Whitley promised to obtain Apple's release from jail in exchange for his cooperation in providing information implicating Marshall and Spurlock. (<u>Id.</u>) The audio

3

tape taken on Sunday, April 29, revealed that a deputy sheriff told Apple "Sarge" was going to "cut him loose" the following day. (Id.) On Monday, April 30, Apple provided a taped statement implicating Marshall and Spurlock, and he was released from jail the same day. (Id.)

Trial testimony did not reveal the events concerning Apple on April 27 and 29, 1990. The jury was led to believe, through the testimony of Apple and Satterfield, that the first time Apple revealed any information about the Malone murder was his statement on Monday, April 30. During direct examination by Whitley, Satterfield denied that any promises had been made to Apple. He testified that to his knowledge, the first time Apple said anything about the murder was during the taped interview taken on April 30, even though Apple had been previously interviewed. Satterfield also denied that Apple received any leniency or reward in exchange for his testimony at trial. (Id. at 616.)

After the jury returned guilty verdicts, the suppressed audio and video tapes surfaced, and it was also revealed that other investigative interviews indicating another individual's responsibility for the murder had been suppressed. Based on this new evidence, Marshall and Spurlock filed motions for new trials. The trial court denied the motions.

The Tennessee Court of Criminal Appeals reversed the convictions. In State v. Marshall, 845 S.W.2d 228 (Tenn. Ct. App.

4

1992), the court held the State unconstitutionally suppressed exculpatory evidence that was in the possession of the State or the Sumner County Sheriff's Department.[1] In <u>State v. Spurlock</u>, 874 S.W.2d 602, 604-605 (Tenn. Ct. App. 1993), the court held the State unconstitutionally suppressed exculpatory evidence, Whitley knowingly elicited false testimony from Apple at trial, and Whitley knowingly allowed Satterfield to testify falsely at trial. (Trial Ex. 1.)

On remand, Whitley recused himself and Tommy Thompson prosecuted Spurlock. Whitley testified against Spurlock in an effort to bolster Apple's testimony.[2] The jury convicted Spurlock of second-degree murder, and he was sentenced to twenty years in prison. Marshall entered a "best interests" plea and was placed on probation for ten years.

Spurlock and Marshall were subsequently exonerated through a new investigation that led to confession by the real killers. Spurlock served over 50 months in jail or prison and Marshall served 31 months in jail or prison.

---

[1]The Court takes judicial notice of this and other published opinions cited in this decision which were not introduced into evidence at the trial. Fed.R.Evid. 201.

[2]On cross-examination, Whitley admitted that in 1990 he did not turn over to defense counsel the audio and video tapes, but he claimed the error was "pure oversight" because the tapes were not in the prosecutor's files, they were locked up in the Task Force office, and it did not cross his mind to turn over the videotape as a Jencks Act statement. (Trial Ex. 6 at Ex. 7.)

Spurlock and Marshall both endured miserable conditions in prison and constantly kept their guard to protect themselves against violence. Spurlock, who is 6' 5" tall, had difficulty sleeping on a short prison bunk. While incarcerated, Spurlock was not permitted to attend the funeral of his uncle, who had helped him make bond after the reversal of his first conviction. Spurlock's six-year relationship with his girlfriend ended. Before his arrest, Spurlock earned approximately $14.00 per hour working as an electrician.

Marshall spent seventeen days in "the hole" while he was held in the Sumner County jail. After receiving a life sentence, he contemplated suicide. While in prison he witnessed violence, including a stabbing in the movie theater. Marshall felt hated and he was alienated from the mother of his children after being accused of killing Malone, who was his girlfriend's brother. Marshall's grandmother died while he was imprisoned, and he was allowed to attend a viewing in handcuffs and shackles. Before his arrest, Marshall earned $12.50 an hour working construction and $8.00 an hour detailing cars. The evidence also shows that Spurlock and Marshall made money through illegal drug trafficking, that Marshall was one of Spurlock's drug customers, and that Marshall testified against Spurlock.

Following their exoneration of the Malone murder, Spurlock and Marshall consulted lawyers about filing civil rights lawsuits.

6

Tennessee attorney G. Whitney Kemper served as counsel for Marshall and local counsel for Spurlock. Defendants Halprin and Diamond-Falk represented Spurlock and Marshall. Neither of them is admitted to practice in Tennessee and both appeared in this Court *pro hac vice*. Halprin served as lead counsel. Halprin and Diamond-Falk were responsible for filing and responding to pleadings in the civil rights cases of both Plaintiffs.

Defendants took the civil rights cases on a contingency fee basis and spent hundreds of hours working on the cases between 1996 and 2003. Defendants achieved success for their clients on various immunity issues raised by the civil rights defendants. See Spurlock v. Satterfield, 167 F.3d 995 (6th Cir. 1999) (Trial Ex. 2). See also Spurlock v. Sumner County, 42 S.W.3d 75 (Tenn. 2001); Spurlock v. Thompson, 330 F.3d 791 (6th Cir. 2004).

The evidence also shows, however, that Defendants missed many deadlines, requested numerous extensions of time to file pleadings, and engaged in conduct, such as unilaterally canceling depositions and ignoring court orders, that was disruptive to the orderly progress of the cases. They acknowledge this Court at one point imposed sanctions on them for approximately $1200 for discovery abuse. (Trial Tr. at 145, 156-159.) In its decision imposing sanctions, the Court characterized Defendants' conduct as "irresponsible, unprofessional, and reprehensible." (Id. at 153-156.)

7

Defendants admit many of Plaintiffs' allegations of negligence, characterizing their own actions as "mistakes" that were "inexcusable," even though they did not result in "terminating sanctions."[3] They also blamed the Magistrate Judge and this Court for not making timely rulings. (<u>Id.</u> at 147, 156-159, 223, 380-382; Trial Ex. 4 at 6 n.4.)

According to Defendants, several decisions they made were strategic based on the manner in which litigation of the civil rights case unfolded. In April 1999, Defendants failed to respond to Satterfield's requests for admissions, with the result that the requests were deemed admitted. According to Halprin, he deliberately did not respond to the requests for admissions because the matters at issue in the requests were not critical to proving Plaintiffs' cases. (Trial Tr. at 196-197.) Halprin further testified that he and Diamond-Falk did not take depositions of key parties because they already knew the facts they needed to know and they did not want to alert the witnesses to material that could be used against them at trial. (<u>Id.</u> at 150-151.)

After prevailing on the immunity issues, the case boiled down to whether Spurlock and Marshall could prove that the prosecutors and investigators manufactured probable cause to prosecute them. (Trial Tr. at 127-128, 130.) In Defendants' view, Plaintiffs could

---

[3]Only Defendant Halprin testified, but Defendant Diamond-Falk adopted his testimony.

8

try to prove the manufacture of probable cause two ways: through Apple's testimony and/or through the tapes made on April 27 and 29, 1990. The parties stipulated prior to trial in this action that Apple filed a sworn answer in the civil rights case on November 6, 1997, and provided a deposition on September 30, 1999, attesting that his statement and testimony against Spurlock and Marshall was truthful. According to Halprin, Apple gave statements on four occasions after the first criminal trials, and at least twice under oath he stated that Whitley and Denver Howell offered him money to lie, but Apple then denied he lied and stated he told only the truth at Spurlock's and Marshall's trials. (Id. at 131; Trial Ex. 6 at Ex. 15 (Apple's statement to TBI); at Ex. 17 (Apple's statement (not under oath) to Gloria Stamps-Smith of Tennessee Board of Professional Responsibility); at Ex. 18 (Apple's Deposition adopting his Verified Answer to Plaintiff's civil rights Complaint).) According to Defendants, Apple's statements that he told the truth precluded them from relying on Apple to prove the manufacture of probable cause. (Trial Tr. at 170-171.)

Plaintiffs' attorney Whitney Kemper testified, however, that he interviewed Apple on tape at a Chattanooga prison. Apple told Kemper that Whitley had gotten on the phone and made certain promises to him. Kemper testified this was contradictory to what Apple told the Tennessee Bureau of Investigation ("TBI"). (Trial Tr. at 78-79, 95.)

According to Defendants, only the tapes remained as an avenue of proof. Halprin knew the tapes first emerged in 1993. (Id. at 204.) Upon accepting representation of Spurlock and Marshall in 1996, Halprin and Diamond-Falk obtained a copy of the tapes from Marshall's criminal defense lawyer, Mark Fishburn. (Id. at 46, 204.) Halprin and Diamond-Falk had the tapes analyzed by Earth Network in Chicago. They learned from Earth Network that there were a number of starts and stops on the audio tapes and the tapes were not originals. Halprin testified,

> So there's no way to explain. It could be somebody just making up a transcript. There was nothing you could do with them, other than the fact that we heard them. They were clear.
>
> And the only thing, I think, that we heard that was untoward on there was what appeared to be a slapping of Apple. Nowhere on those tapes that we heard did I hear Coarsey put [in Apple's mouth] those very bizarre details that really formed Henry Apple's story[.] . . . So the assumption was that the appellate court didn't hear it either.

(Id. at 206-207.) At his deposition, retired deputy George Farmer produced the original case file on the Malone murder. In the file, Halprin and Diamond-Falk found a twenty-two (22) page transcript of Apple's April 27, 1990 interview. (Trial Ex. 6 at Ex. 13.) The parties who took part in the interview were Apple, who was identified as "Skully," Satterfield, and an unidentified interrogator, whom Halprin believed was Coarsey. During depositions, however, Coarsey and Satterfield refused to identify

10

their own voices on the tapes.  (Trial. Tr. at 208.)  Farmer did not know who had made the 22-page transcript.  (Id. at 209.)

Halprin and Diamond-Falk then tried to find the original tapes.  Kemper visited the Clerk's office of the Tennessee Court of Appeals three times searching for the tapes the appeals court had heard when it decided Spurlock in 1993.  The first two times he was told there was no record on file.  The third time he was told the file was retrieved from archives, but there were no tapes in the file.  (Id. at 84.)  Kemper reported to the Magistrate Judge his inability to retrieve the tapes.  Opposing lawyers stated they, too, had been unsuccessful in obtaining the tapes from the court. (Id. at 211.)  The tapes were finally obtained from the state appeals court in February 2000 when the Magistrate Judge called the Clerk of Court while the lawyers were in her chambers.  (Id.) Kemper then obtained an order to check out the tapes, and retrieved the tapes from the file.  He did not listen to the tapes or try to duplicate them.  Kemper took the tapes to Chicago and gave them to Diamond-Falk.  (Id. at 87-92.)

Defendants sent the tapes to an expert, Steve Cain, who was successful in improving the tapes' overall intelligibility.  (Trial Ex. 6 at Ex. 9.)  In a letter dated March 20, 2000, Cain reported preliminarily to Defendants that during the enhancement process, "it was evident that there did exist suspicious record events (i.e. anomalies) on each of the three tapes."  Many of these suspicious events occurred during ongoing speech, "which casts doubt on the

11

original tapes' authenticity and trustworthiness/reliability."
(Id.) Halprin believed he faced an evidentiary problem because the
tapes had suspicious stops and starts and he could not authenticate
them. (Trial Tr. at 212.) Taking Cain's advice, Halprin decided
to pursue a strategy to compel all parties who had copies of the
tapes to turn them over to see what they showed and determine who
was "playing dirty." (Id. at 212-213.)

In the meantime, on February 2, 2000, at Halprin's request,
the Magistrate Judge had extended the deadline for completion of
fact discovery a third time, to June 1, 2000, stating: "Absent
extraordinary circumstances (such as death or lengthy
hospitalization), the Court will be disinclined to extend the June
1, 2000 deadline any further upon requests of the [Defendants]."
On the day of Cain's letter, March 20, 2000, Defendants cancelled
three depositions scheduled for the next week. This was the fourth
cancellation of these depositions. (Id. at 147-148.)

A week later, on March 27, 2000, Defendants filed an emergency
motion to reset the discovery schedule and for production of copies
of the tapes. They also sought court appointment of an expert to
examine the tapes. Defendants wanted time to develop evidence as
to what the various copies of the tapes revealed so that they could
get the transcript admitted into evidence and argue to the jury
that Coarsey put words in Apple's mouth during the suspicious stops
and starts on the tapes. Because Coarsey and Apple both denied
that Coarsey slapped Apple, Defendants wanted to admit the

12

transcript into evidence showing that Coarsey did slap Apple during the interrogation. (Id. at 213-214.) Defendants felt this extension of the discovery deadline was warranted because it appeared the Whitley defendants had somehow been involved in tampering with the tapes, and the Magistrate Judge had stated orally when she set the June 1, 2000 discovery deadline that she might agree to extend the deadline in the event the Whitley defendants had a role in causing a delay in discovery. (Id. at 149.) On April 17, 2000, Defendants sought an extension of time to file a reply brief regarding their emergency motion to reset discovery.

On July 3, 2000, Defendants filed another motion asking for an extension of the discovery deadline. (Id. at 157-158.) On July 25, 2000, the Magistrate Judge denied the motions after the discovery deadline expired on June 1, 2000 and the expert witness declaration deadline expired on July 1, 2000. Defendants appealed the Magistrate Judge's decision to this Court. (Id. at 218.)

On September 22, 2000, while the discovery appeal was pending in this Court, Whitley, Kitchen, Satterfield and Coarsey timely filed their motions for summary judgment. Defendants concede they did not respond to the summary judgment motions by the October 23, 2000 deadline. (Id. at 158-159.)

Instead, on October 25, 2000, Defendants filed a motion to extend time to file a Rule 56(f) request and submitted a Rule 56(f)

13

motion.[4] Halprin testified at trial in this case that his Rule 56(f) motion was timely because "[t]here's no set deadline for filing a 56(f) motion, unless you do it after the summary judgment is granted." (Id. at 159, 224.) Chantel Eldridge, who associated with Halprin and Diamond-Falk to work on the Whitley case, testified Halprin's strategy was to file both a Rule 56(f) motion and responses to the summary judgment motions. (Id. at 474.) According to Eldridge, Halprin intended to file the Rule 56(f) motion before the summary judgment deadline, although she did not believe the motion had to be filed at any particular time. (Id. at 478.)

In response to the request to file a Rule 56(f) motion, Satterfield pointed out that the Tennessee Court of Criminal Appeals granted Plaintiffs' counsel permission to withdraw the tapes from the state appellate record in August of 1997, but counsel did not attempt to withdraw the tapes until 1999. (Spurlock v. Whitley, No. 3:96-0926, Docket Entry No. 290 at 5-6.)

This Court construed the motion to extend time to file a Rule 56(f) motion as one seeking leave to reopen discovery. The Court denied the motion as untimely because it was not filed by October 23, the date a response to the motion for summary judgment was due;

---

[4]The same day, Defendants filed a petition for a writ of mandamus in the Sixth Circuit seeking to compel this Court to rule on the pending appeal of the Magistrate Judge's decision concerning discovery. The Sixth Circuit notified this Court of the pending petition for a writ on October 27, and the Court entered its ruling that day. The Sixth Circuit then denied the writ of mandamus on December 6, 2000.

14

as improper because it was not supported by a Rule 56(f) affidavit; and as lacking merit in light of the extensive history of Defendants' failure to comply with deadlines, as outlined in the Court's Memorandum. (<u>Spurlock v. Whitley</u>, No. 3:96-0926, Docket Entry Nos. 318 & 319.)[5] The Court specifically observed that Plaintiffs had had the opportunity to examine the tapes from the Tennessee Court of Appeals file since August 1997, and it appeared no discovery had been done between November 1999 and June 1, 2000. (<u>Id.</u>, Docket Entry No. 318, Memorandum at 16.) The Court concluded that Rule 56(f) could not be used to excuse neglect, inattention or procrastination, and Plaintiffs did not demonstrate in good faith why they had been unable to discover the essential facts sooner. (<u>Id.</u>)

Defendant Halprin testified he and Diamond-Falk did not fail to respond to summary judgment; rather, they could not respond because they did not have evidence to prove the <u>Whitley</u> defendants' manufacture of probable cause. (Trial Tr. at 110, 159, 165, 170-171, 215-216.) He also testified the decision to pursue Rule 56(f) relief, rather than file a response to the motion for summary judgment, was a strategic decision. (<u>Id.</u> at 223-224.)

On December 17, 2000, fifty-five (55) days after the deadline for responding to summary judgment motions had passed, Defendants filed their responses, along with a motion asking permission to

---

[5]The Court takes judicial notice of these documents filed in the <u>Spurlock v. Whitley</u> case. Fed.R.Evid. 201.

15

file the briefs out of time. Eldridge drafted the summary judgment responses, but Halprin and Diamond-Falk take responsibility for their content and filing. (Id. at 159-162, 165.) Eldridge testified at trial she agreed with Defendants that, without the tapes, there was not sufficient evidence to oppose the summary judgment motions. (Id. at 470.)

This Court subsequently denied the motion to file the briefs out of time. The parties stipulate that this Court granted summary judgment to the individual Whitley defendants on September 27, 2001 and, as a result, the case against Sumner County and City of Hendersonville was dismissed on December 21, 2001, because those defendants could not be held liable in the absence of the individual defendants. (Trial Ex. 3; Trial. Tr. at 168.) In its Memorandum, the Court stated:

> Unfortunately, this is the latest in a long series of requests by Plaintiffs to file after the deadline has passed. As reflected in the record and as described in detail in the Memorandum of May 23, 2001 (Docket Entry No. 318), Plaintiffs have evaded deadlines, ignored court orders, and engaged in abusive litigation practices throughout this lawsuit. Plaintiffs have received a number of extensions, including three extensions of the discovery deadlines. Each time they have presented novel excuses, like the present one, to justify the latest infraction. As a result, the orderly progression of this case has been interrupted, needlessly prolonged, and the costs have expanded. The Court has a responsibility to require the parties to follow the applicable rules and comply with the orders of the Court, and not take improper advantage of the Court or opposing counsel.

(Trial Ex. 3 at 9.) Thereafter, the Court granted judgment on the pleadings in favor of Sumner County and the City of Hendersonville

16

and the Court *sua sponte* granted summary judgment in favor of Apple on the ground that the claims against him could not survive without a viable claim against a state actor.

Halprin and Diamond-Falk appealed the Court's rulings in favor of the <u>Whitley</u> defendants. In the opening appellate brief, Defendants discussed the evidence in Plaintiffs' favor, contended that genuine issues of material fact existed for trial warranting reversal, and argued that a jury could find in Plaintiffs' favor. (Trial Ex. 9.) Halprin testified that the Tennessee Court of Appeals' <u>Spurlock</u> opinion gave counsel a good faith basis to file suit, but the opinion was not admissible as evidence to win the case. In the Sixth Circuit, however, Defendants contended that the <u>Spurlock</u> opinion was secondary evidence of the contents of the tapes. (Trial Ex. 9 at 50-51.) In their reply brief on behalf of Plaintiffs, Defendants stated:

> Although exaggerated by the [<u>Whitley</u>] Defendants and to a lesser extent by the District Court in determining motions which followed the denial of Plaintiffs' emergency motion, Plaintiffs' counsel concede that some of their failures were inexcusable, however not to the extent that they warranted terminating sanctions. In any event no matter how counsel's failures are viewed, they were not implicated in the Magistrate's or the District Court's denial of the emergency motion and request to extend the discovery deadline.

(Trial Ex. 4 at 6 n.4.)

The Sixth Circuit affirmed this Court's Memorandum and Order. (Trial Ex. 5.) The appeals court stated:

17

> Where the nonmoving party fails to respond to a motion for summary judgment by the deadline for such response, the district court cannot grant to the nonmoving party an extension of time to file absent a showing of "cause" for the delay. Fed.R.Civ.P. 6(b). Where no cause is shown, the district court may not entertain late filings.
>
> Where no response to a summary judgment motion is properly before a district court, the court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." [Citation omitted]
>
> . . . .
>
> Plaintiffs failed to submit any timely response to defendants' motions, instead submitting a "Motion for Permission to File Late Filed Briefs in Opposition to Defendants' Motion for Summary Judgment" nearly two months after the deadline for responses to summary judgment motions. Under Rule 6(b), the district court properly declined to extend the deadline for responses and disregarded plaintiffs' late-filed briefs.

(Trial Ex. 5 at 4-5.)

## II. CONCLUSIONS OF LAW

To establish a legal malpractice claim, the Plaintiffs must show: (1) Defendant attorneys owed a duty to the Plaintiffs; (2) Defendant attorneys breached that duty; (3) Plaintiffs suffered damages; (4) the breach of duty was the cause in fact of the Plaintiffs' damages; and (5) the attorneys' negligence was the proximate, or legal, cause of the Plaintiffs' damages. Gibson v. Trant, 58 S.W.3d 103, 108 (Tenn. 2001). A lawyer's conduct is "measured against the degree of care, skill and diligence which is commonly possessed and exercised by attorneys practicing in the same jurisdiction." Cleckner v. Dale, 719 S.W.2d 535, 540 (Tenn.

18

Ct. App. 1986). Except in the most extreme cases, the lawyer's standard of care "should be proved using expert testimony." Id.; Lazy Seven Coal Sales v. Stone & Hinds, P.C., 813 S.W.2d 400, 403 (Tenn. 1991); Rose v. Welch, 115 S.W.3d 478, 484 (Tenn. Ct. App. 2003); Bursack v. Wilson, 982 S.W.2d 341, 343 (Tenn. Ct. App. 1998) (reiterating clear Tennessee rule that expert testimony is required to establish negligence and proximate cause in malpractice action unless alleged malpractice is within common knowledge of laymen). Additionally, whether an attorney's conduct meets a particular standard of care is a question of fact; it is not a question of law for the Court. See Cleckner, 719 S.W.2d at 540. It is the rule in Tennessee that:

> Whether a lawyer's conduct meets the applicable professional standards is generally believed to be beyond the common knowledge of laypersons. Thus, except in cases involving clear and palpable negligence, most courts considering the issue have held that cases of legal malpractice cannot be decided without expert proof regarding the applicable standard of care and whether the lawyer's conduct complies with this standard.

Id.

In Cleckner, the trial court assumed the role of legal expert when it defined the standard of professional conduct in its instructions to the jury. Id. at 541-542. The Court of Appeals reversed the judgment concluding that, since the determination of the applicable standard of professional conduct is a question of fact for the jury, the trial court's comments and instructions infringed upon the jury's responsibilities. Id. at 542-543. Furthermore, the court explained, trial judges should be

19

discouraged from acting as the expert in a legal malpractice case because the parties lack an opportunity to test the weight and reliability of the trial court's opinion, as would be the case if a legal expert were presented to testify before the jury. <u>Id.</u> at 542.

This case is complicated by the circumstance that the Court sits as the finder of fact in place of the jury, but Plaintiffs did not present the testimony of a legal expert to establish the applicable standard of care, to prove that Defendants' actions breached the applicable standard of care, or to prove that Defendants' actions were the proximate cause of Plaintiffs' injury and damage. Although Plaintiffs contend this is one of those extreme cases where the existence of clear and palpable negligence relieves Plaintiffs of presenting the testimony of a legal expert, the Court must conclude that expert legal testimony was needed in this case. <u>Cf.</u> <u>Gray v. Boyle Investment Co.</u>, 803 S.W.2d 678, 683 (Tenn. Ct. App. 1990) (finding clear and palpable negligence where attorney handling real estate transaction took money from purchaser to remit to seller and at time of closing knew property was in foreclosure but failed to advise purchaser and took no corrective measures); <u>Sweat v. Abernathy</u>, No. 02A01-9208-CV-00237, 1993 WL 273892 at *4 (Tenn. Ct. App. 1993) (unpublished) (finding clear and palpable negligence where lawyer failed to attend trial resulting

in judgment against client and failed to prevent foreclosure on property).

The case turns on Defendants' failure to file timely responses to the _Whitley_ defendants' motions for summary judgment. Plaintiffs assert any layperson would understand that missing a court deadline on a dispositive motion constitutes a breach of duty and that Defendants' failure to file a timely response proximately caused the Plaintiffs to lose their chances for recovery.

Lawyers well-versed in the intricacies of summary judgment motions may readily agree with Plaintiffs that this case presents "clear and palpable negligence." As an attorney and judge, the Court is unimpressed with Defendant Halprin's testimony that he made a strategic decision to file an untimely Rule 56(f) motion without filing a timely response to the summary judgment motions. His testimony lacks credibility in light of the vigorous arguments Defendants made in the appellate briefs seeking reversal of this Court's summary judgment ruling in favor of the _Whitley_ defendants and in light of Halprin's contradictory trial testimony that "we started this case out by knowing that Apple was lying. So did everybody else in the whole world." (Trial Tr. at 210.)

The same evidence and arguments Defendants made to the Sixth Circuit in an effort to save the case from its final demise could have been timely presented in this Court in response to the _Whitley_ defendants' summary judgment motions. Such evidence, including the

21

untruthfulness of Apple's trial testimony against Spurlock and Marshall in light of their later exoneration, the numerous contradictions in the statements and conduct of Apple, Whitley, Coarsey, and Satterfield, Apple's admissions to Stamps-Smith and Kemper that he was induced to lie at the criminal trials, and the obvious untruthfulness of Apple's later statements that he was not coerced to testify against Spurlock and Marshall likely would have been sufficient to withstand summary judgment and proceed to jury trial. It is at least plausible, as Defendants argued to the Sixth Circuit, that a jury easily could have concluded that the individual defendants committed acts in violation of Spurlock's and Marshall's constitutional rights.

The asserted defense of litigation strategy, however, is not easily examined by the ordinary, lay fact-finder without the aid of expert legal testimony. The Court may not sit as Plaintiff's legal expert, but must evaluate the case as an ordinary layperson. Defendants claim their decisions to file a late Rule 56(f) motion and a late response to the summary judgment motions were tactical choices undertaken in light of the status of the case at the time the filings were made and in light of Defendants' previous unsuccessful attempts to obtain an extension of the discovery deadline. See Woodruff v. Tomlin, 616 F.2d 924, 930 & n.1 (6th Cir. 1980) (holding an attorney may not be held liable for choice of trial tactics and conduct of case based on professional judgment,

but attorney must exercise reasonable degree of skill and care in all professional undertakings). An ordinary layperson untrained in law would have no frame of reference to know what "discovery" is, how discovery and motion deadlines operate, what a "summary judgment motion" is, what a "Rule 56(f) motion" is, the reasons why and when such motions may be filed, and the consequences of failing to file such motions at the appropriate times.

The Court possesses specialized knowledge in this area, and could easily recite the law and apply it to the facts of this case. See e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (observing any potential problem with a premature summary judgment motion can be handled under Rule 56(f), "which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery."); Cacevic v. City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000) (explaining party invoking Rule 56(f) must do so in good faith through affidavits demonstrating why ruling on summary judgment should be postponed to permit further discovery that party can use to rebut movant's showing of absence of genuine issue of material fact); Emmons v. McLaughlin, 874 F.2d 351, 356-357 (6th Cir. 1989) (same); Shavrnoch v. Clark Oil and Refining Corp., 726 F.2d 291, 294 (6th Cir. 1984) (same); Lewis v. ACB Business Services, Inc., 135 F.3d 389, 409 (6th Cir. 1998) (holding party filing Rule 56(f) motion has no absolute right to additional

23

time for discovery); <u>Estes v. King's Daughter Med. Ctr.</u>, 59 Fed. Appx. 749, 754-755 (6th Cir. 2003) (discussing appropriate use of Rule 56(f) motion and noting such motion is untimely if filed after the period within which to respond to motion for summary judgment); <u>Morrissey v. Boston Five Cents Sav. Bank</u>, 54 F.3d 27, 35 (1st Cir. 1995) (explaining use of Rule 56(f) motion and requiring "timely proffer").  Where the Court sits as an ordinary finder of fact, however, it is not the Court's role to recite and apply the law, and to place its own legal imprimatur on the evidence presented. Rather, the Court must be guided by the principles applicable to proof in a malpractice case:

> We believe that whether an attorney has failed to meet [the standard of reasonable care and diligence] requires a knowledge of the issues involved in the litigation, what proof is available, what steps were taken to advance the client's interests, and what reasons lay behind the choices made.  With all the facts, a skilled, experienced trial lawyer could give an opinion about how the attorney's actions measured up to the standard of reasonable skill and care.  <u>Ordinary laymen (even judges) could not say that the attorney's conduct fell below that standard.</u>

<u>Allen v. Wiseman</u>, No. 01-A-01-9710-CV00565, 1998 WL 391803 at *3 (Tenn. Ct. App. 1998) (unpublished) (emphasis added).

The issue of breach of duty may be resolved as a matter of law "if the particular conduct does not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of him." <u>Id.</u> at *4.  On the evidence admitted at trial, however, a reasonable doubt would arise in the mind of an ordinary, lay

24

fact-finder as to the applicable standard of care and whether the Defendants' conduct violated the standard of care. The issue could be resolved in Plaintiffs' favor only by the admission of expert legal testimony resolving these issues. Such testimony was not presented in this case. See Rose, 115 S.W.3d at 485 (holding expert testimony was required to establish that attorney's failure to meet standard of conduct was not within the common knowledge of laypersons); Bursack, 982 S.W.2d at 345 ("No amount of lay testimony can suffice in this malpractice case criticizing the tactical decision to allow a default judgment to be entered . . . in the hope thereby of being able to re-litigate the collateral estoppel issue in a bankruptcy proceeding.")

### III. CONCLUSION

Accordingly, for the reasons stated, the Court will enter judgment in favor of Defendants due to Plaintiffs' failure of proof, through expert legal testimony, on the applicable standard of care, whether Defendants' conduct breached the standard of care, and whether Defendants' conduct was the proximate cause of injury and damage.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

25